IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARIN R. PETTAWAY,           *
                             *
     Plaintiff,              *
                             *
vs.                          *    CIVIL ACTION 06-00880-WS-B
                             *
MICHAEL J. ASTRUE,           *
Commissioner of             *
Social Security,            *
                             *
     Defendant.              *

## REPORT AND RECOMMENDATION

Plaintiff Darin R. Pettaway ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for period of disability, disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq., and 1381 et seq.  This action was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Oral argument was waived.  Upon careful consideration of the administrative record and the memoranda of the parties, it is **RECOMMENDED** that the decision of the Commissioner be **REVERSED and REMANDED**.

## I.   Procedural History

Plaintiff initially filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) in

1

August 2002. (Tr. 69-71). His applications were denied upon initial consideration by the Social Security Administration in a Notice dated October 4, 2002. (Tr. 31-32). Plaintiff did not request a hearing or otherwise seek to appeal the decision. As a result, the decision denying Plaintiff's initial applications for benefits through October 4, 2002 became final.

Plaintiff protectively filed applications for DIB benefits and SSI benefits on June 18, 2003. Plaintiff alleges that he has been disabled since April 9, 1999 due to back pain, fractured discs, bruised spinal cord, incontinence, and lack of motor skills in his left arm. (Tr. 72-74, 133-142, 386-388).[1] Plaintiff's applications were denied at the initial level, and he filed a timely Request for Hearing. (Tr. 33-34, 389-390, 45). On October 4, 2004, Administrative Law Judge Glay E. Maggard ("ALJ") held an administrative hearing, which was attended by Plaintiff, his representative, and James Miller, a vocational expert. (Tr. 428-448). Subsequent thereto, additional medical evidence was obtained in connection with Plaintiff's applications, and on April 19, 2005, ALJ Maggard held a second hearing, which was attended by Plaintiff, his representative, and Sue Berthaume, a vocational expert. (Tr. 408-427). ALJ Maggard issued an unfavorable decision finding that

---

[1]The earlier decision denying Plaintiff benefits through October 4, 2002 is not before the Court because Plaintiff did not appeal that decision. Accordingly, the issue before this Court, pursuant to 20 C.F.R. §§ 404.957(c)(1) and 416.1457(c)(1), is whether Plaintiff was disabled from October 5, 2002 through December 31, 2004, his date last insured. (Tr. 31-32 35-39, 372-378,379-384).

Plaintiff is not disabled. (Tr. 11-30). Plaintiff's request for review was denied by the Appeals Council ("AC") on November 3, 2006. (Tr. 6-8). The ALJ's decision became the final decision of the Commissioner in accordance with 20 C.F.R. § 404.981. (Id.) The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.   Issues on Appeal

A.   Whether the ALJ erred by rejecting the opinions of Mr. Pettaway's treating physicians and finding that he retains the residual functional capacity to perform light work.

B.   Whether the ALJ failed to properly evaluate Mr. Pettaway's testimony of disabling pain.

C.   Whether the ALJ erred in finding that Mr. Pettaway has no severe mental impairment.

## III. Factual Background

Plaintiff was born on December 23, 1968 and was 36 years old at the time of the first administrative hearing. (Tr. 72, 411, 442-443). Plaintiff has a 10th grade education and past relevant work ("PRW") as a ship supply worker, ram tool supply worker, and merchant seaman. (Tr. 135, 140, 146-150, 162-170, 435). Plaintiff reported that he has not worked since April 1999 when he fell down twenty-one steps onto the steel deck of a ship. (Tr. 431). According to Plaintiff, as a result of the accident, he suffered a spinal cord injury which results in sever, chronic pain that radiates to his shoulder and into his lower back (Tr. 436).

Plaintiff reported that he has constant pain, is unable to bend and pick up light objects, and must periodically lie down up to three hours a day. (Tr. 436-437, 439). Plaintiff also reported that he alternates between sitting, standing and walking to relieve the pain, and that if he moves his shoulders with his neck, this helps to stop the pain from radiating down to his neck. (Tr. 415-416, 436, 438). Plaintiff further reported that he also suffers from depression, headaches and incontinence. (Tr. 134, 413).

Plaintiff testified that he is able to care for his own personal needs, that he takes two of his daughters to school every day, and that he cares for a third daughter, a three year old who is home with him every day. Plaintiff also indicated that he does light house work and watches after the children upon their return from school; however, he is not able to perform any major chores. (Tr. 416, 417, 441). He reported that he stopped working due to constant pain, inability to bend and pick up light objects, headaches, and incontinence. (Tr. 134).

Plaintiff reported that his medications include Triavil, Per-Phen/Amit, Soma, and Lorcet. (Tr. 185, 187). According to Plaintiff, his depression medication causes side effects such as paranoia, non-responsiveness, and inability to concentrate. (Tr. at 414).

## IV. <u>Analysis</u>

### A. <u>Standard of Review</u>

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).[2] A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. DIST. LEXIS 10163 (S.D. Ala. 1999).

**B.   Discussion**

An individual who applies for Social Security disability

---

[2] This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

benefits must prove his disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability. 20 C.F.R. §§ 404.1520, 416.920.[3]

In case <u>sub judice</u>, the ALJ determined that Plaintiff met the non-disability requirements for a period of disability and disability insurance benefits and was insured for benefits through December 31, 2004. (Tr. 28). The ALJ found that Plaintiff has not

---

[3]The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. <u>Jones v. Bowen</u>, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history. <u>Id</u>. at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. <u>Sryock v. Heckler</u>, 764 F.2d 834 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. <u>Jones v. Apfel</u>, 190 F.3d 1224, 1228 (11th Cir. 1999). <u>See also Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing <u>Francis v. Heckler</u>, 749 F.2d 1562, 1564 (11th Cir. 1985)).

engaged in substantial gainful activity since his alleged onset date. (Id.) The ALJ concluded that while Plaintiff has the severe impairment of cervical degenerative disc disease ("DDD") and a lumbar strain, these impairments do not, individually or in combination, meet or medically equal the criteria for any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulations No. 4. (Id.) The ALJ found that Plaintiff's allegations regarding his limitations were not credible as to a disabling impairment. (Id.) The ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") to perform work at the light level of exertion, stating specifically that he can sit, stand, or walk one hour at a time, and sit eight hours, stand six hours, and walk four hours total in an eight hour workday; he can lift up to 50 pounds occasionally and up to 25 pounds frequently, and carry up to 25 pounds occasionally and up to 20 pounds frequently; he can frequently reach; and he can occasionally bend, squat, crawl and climb. The ALJ also concluded that Plaintiff cannot work at unprotected heights, is moderately limited in his ability to work near moving machinery, and is mildly impaired in his ability to drive automotive equipment. (Tr. 29). The ALJ further determined that Plaintiff cannot return to his past relevant work, but is capable of performing a significant number of occupations in the national economy. (Id.)

The relevant medical evidence of record is summarized as

7

follows:

In April 1999, Plaintiff began receiving treatment for injuries sustained in connection with a fall at work.  A CT scan in June 1999 revealed a disc bulge and osteophytic changes, and an MRI in July 2000 revealed a bulging disc and multiple herniated discs. (Tr. 266, 194-195).  The records reflect that during the time periods relevant to this case, Plaintiff received treatment from various doctors, namely Kenneth Adatto, M.D., John J. Watermeier, M.D. and Stuart Phillips, M.D., at Orleans Orthopedic Associates. On June 11, 2002, Plaintiff was seen by Dr. Phillips, who noted that Plaintiff has been under the care of Dr. Rauchwerk, who had since retired.  Plaintiff reported persistent low back pain, and indicated that he needed medication.  Plaintiff also reported that he had neck pain and right knee pain, that the neck pain was mild, and that his right knee gives way, but he could live with it.  He further reported that his low back pain was severe and that he was experiencing a steady decrease in his daily activities.  (Tr. 331).

Upon physical examination, Dr. Phillips found that there was less than 50% loss of lumbar motion in forward flexion, extension and lateral bending; tenderness from L3 to the sacrum; marked paravertebral spasm; bilateral positive straight leg lifting test; an absence of Achilles reflex bilaterally; weakness of the extensor hallucis longus and peroneal muscles; no atrophy of the lower legs;

8

no long tract signs or advancing paralysis; the peripheral pulses were intact; AP, lateral and obliques of the lumbar spine showed normal segmentation; a normal lumbar lordotic curve; minimal degenerative changes; no acute fractures or dislocations were noted; no spondylolisthesis or spondylolysis were noted; AP of the pelvic, including sacroiliac joints and hip joints, showed component bones to be of normal density; rather marked degenerative changes were present in both sacroiliac joints; and early changes in the hip joints were noted as was the fact that the bones were well mineralized. (Tr. 330).

Dr. Phillips also noted that Plaintiff had an appropriate "work up" by Dr. Rauchwerk, and that the "work up" had basically been negative. He further noted that Plaintiff's symptoms are relatively severe and that, "[p]atients who have severe symptoms with a negative 'work up' are a great diagnostic challenge." Dr. Phillips suggested that Plaintiff be placed on Triavil, and that he receive a lumbar Morphine epidural as an inpatient. He also suggested a psychiatric interview. Additionally, Dr. Phillips noted that, "I do not believe he has a lumbar herniated nucleus pulposus or specific lumbar radiculitis. I do not believe he's a candidate for invasive testing and I do not believe there is any surgery that is indicated." He diagnosed Plaintiff with lumbar disc displacement and lumbosacral neuritis, and listed his disability status as "total, temporary." (Tr. 330).

9

Dr. Phillips next saw Plaintiff on June 27, 2002, and noted that he had not reviewed Dr. Rauchwerk's reports when he initially saw Plaintiff. Dr. Phillips noted that Plaintiff's physical examination was not normal, that there were objective findings in the lumbar spine of muscle spasm and a positive leg raise test; but on the other hand, the testing in the lumbar spine was negative including the MRI, discogram and the EMG. (Tr. 329).

On this visit, Plaintiff reported cervical and lumbar complaints. According to Dr. Phillips, when he went back over the imaging, he noted that Plaintiff has a cervical herniated nucleus pulposus and that there was multiple level involvement but C5/6 was relatively severe. Dr. Phillip's physical examination of Plaintiff revealed bilateral paravertebral muscle spasm in the cervical paraspinal muscles; a positive Spurling's and Adson's signs; decreased biceps reflexes in the upper extremities, and diminished muscle strength in grasp of the hand; sensations decreased in the C5 dermatome; marked mechanical signs in the lumbar spine; muscle spasm and tenderness in the lumbar paravertebral muscles; limited motion and pain on the extremes of motion; straight leg raising test was positive bilaterally; exam of the lower extremities was within normal limits; and there were no pathological reflexes. (Tr. 328-329).

Dr. Phillips noted that he was amending his previous report to reflect that he did not think Plaintiff's problem was

psychological. He opined that Plaintiff has radiculitis as the cervical pain could radiate into the lumbar area and cause lumbar discomfort. Dr. Phillips suggested a cervical discogram and post discogram CT in order to evaluate Plaintiff's problem. He noted that Plaintiff presented a "difficult diagnostic problem," as he presented symptoms in both the cervical and lumbar spine. Dr. Phillips opined that Plaintiff was totally disabled from manual labor and noted that Plaintiff has an active cervical disc and abnormalities on physical exam in both the cervical and lumbar spine. (Tr. 328).

Plaintiff was next seen by Dr. Phillips on August 13, 2002. Dr. Phillips noted that they had not been able to arrange for the discrogram, and that it was needed in order for him to make a diagnosis. His physical examination revealed bilateral paravertebral muscle spasm in the cervical paraspinal muscles; positive Spurling's and Adson's signs; upper extremities' exam showed normal reflexes and good muscle strength; sensation was intact in both upper extremities; no evidence of peripheral nerve entrapment was noted; marked mechanical signs in the lumbar spine were noted; limited motion and pain on the extremes of motion; straight leg raising test was positive bilaterally; exam of the lower extremities was within normal limits, and there were no pathological reflexes. Dr. Phillips noted that Plaintiff tolerated his medication well, and opined that Plaintiff was still disabled.

(Tr. 327).

Plaintiff was seen again by Dr. Phillips on October 10, 2002. Plaintiff reported moderate pain in the lumbar spine which increases with activity, stiffness and no radiating pain in the lower extremity.  Upon an examination of Plaintiff, Dr. Phillips noted that Plaintiff was oriented to time, place and person; he was in no acute distress; he displayed no sign of depression or anxiety; he walked with a normal gait; the lumbar exam was abnormal; visual inspection revealed no gross abnormality over the painful area; there was moderate tenderness of the lower lumbar spine and sacrum reproducing pain and associated with mild to moderate soft tissue spasm; a 20 to 30 percent loss of lumbar motion; the straight leg raising test in the recumbent position reproduced symptoms of low back pain at 45 to 60 degrees; the bilateral lower extremity neurological exam revealed no sensory, motor or reflex abnormalities; there was no calf atropy; and the peripheral pulses were equal and present.  Dr. Phillips diagnosed Plaintiff with lumbar discogenic pain, and cervical and lumbar disc syndrome, but noted that Plaintiff had not been approved for the discogram of the lumbar spine; thus, he could not make a specific diagnosis.  Dr. Phillips further noted that Plaintiff had subjective complaints of pain and objective findings of lumbar tenderness, spasm and loss of motion. Plaintiff was continued on his medication.  (Tr. 326).

Plaintiff was seen again by Dr. Phillips on December 18, 2002. His physical examination of Plaintiff revealed bilateral paravertebral muscle spasm in the cervical paraspinal muscles; positive Spurling's and Adson's signs; upper extremities' exam showed normal reflexes and good muscle strength; sensation was intact in both upper extremities; no evidence of peripheral nerve entrapment was noted; marked mechanical signs in the lumbar spine were noted; muscle spasm and tenderness in the lumbar paravertebral muscles were noted; limited motion and pain on the extremes of motion; straight leg raising test was positive bilaterally; exam of the lower extremities was within normal limits; and there were no pathological reflexes. Dr. Phillips noted that Plaintiff tolerated his medication well, and again opined that further testing was needed in order for him to make a definitive diagnosis. Dr. Phillips diagnosed Plaintiff with cervical/lumbar disc displacement, and listed his disability status as total permanent. (Tr. 325).

When Plaintiff returned to the Orleans Orthopaedic Associates in March 2003, he was seen by John J. Watermeir, M.D. Plaintiff reported constant neck symptoms, moderate neck pain, pain between shoulders, left and right arm pain, numbness into arms and left hand, and weakness in hands or upper extremity radiating symptoms in C6-C7. The notes reflect that the physical examination of the cervical spine reveals mild loss of the lordotic curve; tenderness

of the paraspinous muscles and spine; limitation of normal cervical motion in flexion, extension, and lateral rotation; pain on axial loading test; abnormal sensory exam of left upper extremity; and weakness of the left wrist extensors.  The specific level of discomfort was C5, C6, trigger point pain in areas of the trapezius.  Dr. Watermeier diagnosed Plaintiff with cervical disc syndrome and cervical radiculitis, opined that Plaintiff's condition was worsening and listed his prognosis as "guarded."  He did not recommend surgery, but did recommend therapy, to include home exercises. He also listed Plaintiff's disability status as "total permanent spinal disability."  (Tr. 323-324).

Plaintiff was next examined by Dr. Watermeir on April 10, 2003.  Plaintiff reported constant neck symptoms, moderate neck pain, aching, stiffness, and soreness between the shoulders. Plaintiff also reported that he had gone to the ER in Mobile at Providence Hospital due to severe left arm tingling and numbness. A physical examination of Plaintiff's cervical spine revealed loss of the lordotic curve, with absence of tilt or scoliosis; moderate spasm of the paraspinous muscles; moderate tenderness of the spine; moderate limitation of cervical motion in flexion, extension and lateral rotation; and pain on axial loading test.  The right and left biceps, triceps and brachioradialis reflex were equal and active bilaterally.  The cranial nerves II-XII were grossly intact, there was a full range of motion of the shoulders and symmetrical

muscular development and strength of both upper extremities. Plaintiff had a negative Tinel's and Phalen's test of the right and left wrist. Dr. Watermeier diagnosed Plaintiff with cervical disc displacement and cervical radiculitis. Plaintiff's status was listed as stable, and his prognosis was fair. Plaintiff's treatment plan included home exercise and medication. Dr. Watermeier did not recommend any surgical treatment, invasive testing or diagnostic "work up" for Plaintiff. (Tr. 321).

When Plaintiff returned to Orleans Orthopaedic Associates in July 2003, he was seen by Dr. Adatto. Plaintiff reported neck and back pain, occasional moderate headaches, depression, disturbed sleep, erectile dysfunction, nocturia and frequent urination. Dr. Adatto's treatment notes reflect that Plaintiff walked with a stiff gait. His cervical exam revealed loss of lordotic curve, with absence of tilt or scoliosis; moderate spasm of the paraspinous muscles and moderate tenderness of the spine; moderate limitation of cervical motion in flexion; extension and lateral rotation; and pain on the Axial loading test. The cranial nerves II-XII were grossly intact and there was a full range of motion of the shoulders and symmetrical muscular development and strength of both upper extremities. (Tr. 318-319).

A lumbar exam revealed the absence of tilt and scoliosis, moderate tenderness of paraspinous muscles and spinous process with loss of motion of the spine in forward flexion and extension.

15

Spasm was present.  The notes further reflect that the straight leg raising reproduced low back pain discomfort and leg pain in the sitting and recumbent position.  The lower extremity neurological exam revealed weakness of the right and left extensor hallucis longus muscle, and weakness of the right and left anterior tibialis muscle.  Plaintiff was diagnosed with displacement of cervical intervertebral disc and displacement of lumbar intervertebral disc. Plaintiff's status was listed as stable and his prognosis as fair. His treatment plan included home exercise and medication.  (Tr. 318).

Dr. Adatto opined that Plaintiff has a total and permanent disability, and that he should avoid repetitive looking up and down, working with his arms above his shoulders, repetitive stooping or bending, repetitive lifting of objects over 25-50 pounds, and prolonged sitting or standing in the same position for 45 minutes without changing positions.  He further opined that Plaintiff's disability and restrictions are the same with or without surgery.  (Tr. 319-320).

Plaintiff was next seen by Dr. Adatto in September 2003. Plaintiff again reported neck and back pain.  The treatment notes reflect that Plaintiff complained of constant, lower lumbar moderate pain, aching, stiffness, soreness and twitching and jumping in his legs.  The notes further reflect that Plaintiff stood erect and walked with a normal gait, and that he demonstrated

no anxiety or depression.  His cervical exam again revealed loss
of lordotic curve, with absence of tilt or scoliosis; moderate
spasm of the paraspinous muscles and moderate tenderness of the
spine; moderate limitation of cervical motion in flexion, extension
and lateral rotation; and pain on the axial loading test.  The
cranial nerves II-XII were grossly intact and there was a full
range of motion of the shoulders and symmetrical muscular
development and strength in both upper extremities. A lumbar exam
revealed the absence of tilt and scoliosis, moderate tenderness of
paraspinous muscles and spinous process with loss of motion of the
spine in forward flexion and extension.  Spasm was present.  The
notes further reflect that the straight leg raising reproduced low
back pain discomfort and leg pain in the sitting and recumbent
position.  Patella and Achilles reflex exams were equal and active
bilaterally and there was good motor strength of the right and left
lower extremity.  The notes also reflect normal sensory exam to
light touch of right and left lower extremity and that pedal pulses
were palpable and felt to be within normal limits bilaterally.
Plaintiff was diagnosed with displacement of cervical
intervertebral disc and displacement of lumbar intervertebral disc.
Plaintiff's status was listed as stable and his prognosis as fair.
His treatment plan included home exercise and medication.  Dr.
Adatto also noted that Plaintiff is a "chronic pain" patient who
has a work impairment of the cervical and lumbar spine of 10% -15%,

17

and that his disability is permanent. (Tr. 315-316).

On December 15, 2003, Dr. Adatto completed an "Estimated Functional Capacity Form" and opined that Plaintiff can lift up to 10 pounds frequently and 24 pounds occasionally, but can never lift more than 24 pounds. He further opined that Plaintiff can push/pull occasionally, and can sit three hours, stand two hours, and walk one hour total in an eight-hour workday in periods not to exceed 45 minutes without changing position. (Tr. 313-314).

Plaintiff was next treated at the Orleans Orthopaedic Associates on December 31, 2003, and was examined by Dr. Watermeier. He reported the same complaints, and his physical examination revealed the same results as the prior examination. On physical examination of Plaintiff's cervical spine, Dr. Watermeier noted a loss of lordotic curve, with absence of tilt and scoliosis; moderate spasm of the paraspinous muscles and moderate tenderness of the spine; moderate limitation of cervical motion in flexion, extension, and lateral rotation; pain on axial loading test, the right and left biceps, triceps and brachioradialis reflexes were equal and active bilaterally; the cranial nerves II-XII were grossly intact and there was a full range of motion of the shoulders and symmetrical muscle development and strength of both upper extremities. The specific level of discomfort was trigger point pain in the area of the trapezius. (Tr. 353-354).

On physical examination of the lumbar spine, Dr. Watermeier

reported an absence of tilt and scoliosis, moderate tenderness of the paraspinous muscles and spinous process with a moderate loss of motion of the spine in forward flexion and extension. Spasm was present.  The notes also reflect that the straight leg raising test reproduced only low back discomfort in the sitting and recumbent position. Patella and Achilles reflex exams were equal and active bilaterally and there was good motor strength of the right and left lower extremity.   The notes also reflect normal sensory exam to light touch of right and left lower extremity and that pedal pulses were palpable and felt to be within normal limits bilaterally. Plaintiff was diagnosed with displacement of cervical intervertebral disc, displacement of lumbar intervertebral disc, and spinal enthesopathy.  Plaintiff's status was listed as stable and his prognosis as fair.  His treatment plan included home exercise and medication. He was given an injection into the left cervical paraspinous muscles.  (Tr. 353-354).

Plaintiff was next seen by Dr. Watermeir on March 31, 2004. The notes reflect that Plaintiff walked with a stiff gait, and he stood bent forward.  Plaintiff reported the same symptoms.   The physical examination of Plaintiff was essentially the same, his diagnosis was the same, as was his treatment plan of medication and home exercises.  He was given an injection into the left cervical paraspinous muscles.  Dr. Watermeir gave Plaintiff a permanent anatomical impairment rating of 10-15% of the cervical spine and

10-15% of the lumbar spine, and listed Plaintiff's work status as temporarily disabled. (Tr. 351-352).

Plaintiff was next seen by Dr. Watermeier on June 30, 2004. An examination of Plaintiff's cervical spine revealed mild muscle tenderness and mild to moderate muscle spasm. Plaintiff's range of motion was limited to 25% in forward flexion, backward extension, and lateral rotation. Mild to moderate pain on axial compression was noted. Deep tendon reflexes of the biceps, triceps, and brachioradialis were hypoactive but equal, and his grip strength was fair bilaterally. There was no evidence of sensory deficit, and a full range of motion of both shoulders was present with mild pain. Sensation was intact. (Tr. 349-350).

A lumbar examination revealed a normal lumbar lordotic curve, mild tenderness to palpation of the lumbar spine and no evidence of muscle spasm. Additionally, it was noted that mobility of the lumbar spine is 75 to 80 percent in forward flexion, backward extension, and lateral rotation. Plaintiff was able to walk on his heels and toes without difficulty. The notes further reflect that straight leg raising was mildly uncomfortable bilaterally in both sitting and lying down position, and that distal pulses were palpable. The deep tendon reflex of the patella and Archilles were +2 and equal. There was good extensor muscular tone, no evidence of sensory deficit, and mild tenderness over the sacroiliac joint. Plaintiff was again diagnosed with displacement of cervical

20

intervertebral and displacement of lumbar intervertebral disc, and his treatment remained unchanged. Once again, Dr. Watermeir gave Plaintiff a permanent anatomical impairment rating of 10-15% of the cervical spine and 10-15% of the lumbar spine, and listed Plaintiff's work status as temporarily disabled. Plaintiff was directed to return after testing was completed. (Tr. 349-350).

Plaintiff was examined in the office of Orleans Orthopaedic Associates on September 22, 2004; however, the records do not reflect who conducted the examination. The notes reflect that Plaintiff was in no apparent acute distress, that he stood erect and walked with a normal gait, and that he did not demonstrate any anxiety or depression. An examination of Plaintiff's cervical spine revealed mild muscle tenderness; mild to moderate muscle spasm; 25% range of motion in forward flexion, backward extension, and lateral rotation; mild to moderate pain on axial compression; hypoactive deep tendon reflexes of the biceps, triceps, and brachioradialis; and fair grip strength bilaterally. There was no evidence of sensory deficit. Plaintiff had a full range of motion of both shoulders with mild pain, and the sensation was intact. (Tr. 360-361).

An examination of the lumbar spine revealed a normal lumbar lordotic curve, mild tenderness to palpation, and no evidence of muscle spasm. Mobility of the lumbar spine was 75 to 80 percent in forward flexion, backward extension, and lateral rotation.

21

Plaintiff was able to walk on heels and toes without difficulty, and his straight leg raising was mildly uncomfortable in both the sitting and lying down position. The distal pulses were palpable. The deep tendon reflex of the patella and Archilles were +2 and equal. There was good extensor muscular tone, no evidence of sensory deficit, and mild tenderness over the sacroiliac joint. Plaintiff received an injection into the left lumbar paraspinous muscles. His diagnosis and prognosis remained the same. (Tr. 360-361).

On the same day, Sarah Bolt, PA-C, with Orleans Orthopaedic Associates completed a physical capacities evaluation of Plaintiff. In the evaluation, Ms. Bolt opined that Plaintiff is limited to sitting, or standing/walking one hour at a time and three hours total in an eight-hour workday, lifting/carrying up to 10 pounds frequently, and 20 pounds occasionally, and bending, squatting, crawling, climbing and reaching occasionally. She also opined that Plaintiff has moderate restrictions on activities involving unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, driving automobile equipment, and exposure to dust, fumes, and gases. Ms. Bolt completed a Clinical Assessment of Pain on the same day in which she indicates that Plaintiff's pain is present to such an extent as to be distracting to the adequate performance of work activities, and that prescribed medication side effects can be expected to be

severe and to limit his effectiveness due to distraction, inattention, and drowsiness. (Tr. 356, 357).

Plaintiff was next seen at the Orleans Orthopaedic Associates on December 21, 2004. On physical examination of Plaintiff's cervical spine, Dr. Watermeier noted a loss of lordotic curve, with absence of tilt and scoliosis; moderate spasm of the paraspinous muscles and moderate tenderness of the spine; moderate limitation of cervical motion in flexion, extension, and lateral rotation; pain on axial loading test; the right and left biceps, triceps and brachioradialis reflexes were equal and active bilaterally; the cranial nerves II-XII were grossly intact; and there was a full range of motion of the shoulders and symmetrical muscle development and strength of both upper extremities. The specific level of discomfort was trigger point pain the area of the trapezius. (Tr. 353-354).

On examination of Plaintiff's lumbar spine, Dr. Watermeier noted an absence of tilt and scoliosis, moderate tenderness of the paraspinous muscles and spinous process with a moderate loss of motion of the spine in forward flexion and extension. Spasm was present. The notes also reflect that the straight leg raising test reproduced only low back discomfort in the sitting and recumbent position. Patella and Achilles reflex exams were equal and active bilaterally and there was good motor strength of the right and left lower extremity. The notes also reflect normal sensory exam to

23

light touch of right and left lower extremity and that pedal pulses were palpable and felt to be within normal limits bilaterally. Plaintiff was diagnosed with displacement of cervical intervertebral disc and displacement of lumbar intervertebral disc. Dr. Watermeier listed Plaintiff's status as stable, and noted that Plaintiff's prognosis was poor for full recovery. Plaintiff was prescribed medication and home exercise.  He was also given an injection into the left cervical paraspinous muscles.  (Tr. 353-354).

On March 22, 2005, Dr. Adatto completed an "Estimated Functional Capacity Form," in which he restricts Plaintiff to lifting/carrying up to 10 pounds frequently and up to 34 pounds occasionally.  Plaintiff was also restricted to occasionally pushing and pulling within those weight guidelines, while seated, standing, bending, squatting, or crawling.  Plaintiff was restricted from climbing and could occasionally reach above shoulder level.  Additionally, Plaintiff was restricted to sitting three hours, standing two hours, and walking one hour total in an eight-hour workday. It was also noted that those activities need to be alternated.  Dr. Adatto opined that Plaintiff has a total permanent spinal disability, and listed a disability rating of 10-15% of the cervical spine and 10-15% of the lumbar spine.  (Tr. 367-368)

The record also reflects that, at the request of the Agency,

Lucille T. Williams, Psy.D conducted a consultative examination of Plaintiff on August 20, 2003.  Dr. Williams observed that Plaintiff's thought processes were grossly intact, and that no loose associations, tangential, or circumstantial thinking was noted.  Plaintiff did not appear confused and his conversation was normal.  His ideas of reference, phobias, obsessions or compulsions were not noted. Additionally, no hallucinations or delusions were noted, and Plaintiff denied any current suicide ideation.  Dr. Williams found that Plaintiff's insight and understanding were good, and that he was able to manage his funds.  Dr. Williams also noted that Plaintiff, in describing his daily activities, indicated that he cooks, cleans up a little bit, watches tv, goes to church occasionally, runs errands every now and them, talks on the phone, and help his daughters with their homework.  Dr. Williams diagnosed Plaintiff with depressive disorder, and opined that it was likely that within the next six to twelve months, Plaintiff would have a favorable response to treatment, including psychotherapy.  (Tr. 283-285).

On September 5, 2003, Consultant Patricia Hinton, Ph.D. reviewed the records and prepared a Mental Residual Functional Capacity Assessment.  She opined that Plaintiff is moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, and to maintain attention and concentration for extended periods.  (Tr. 286-289).

25

In a Psychiatric Review Technique form, Dr. Hinton diagnosed Plaintiff with depressive disorder, and indicated that he is mildly restricted in his activities of daily living and in maintaining social functioning, and is moderately limited in maintaining concentration, persistence, or pace. (Tr. 290-305).

On September 9, 2003, Medical Consultant A. Lassiter reviewed Plaintiff's medical records and prepared a Physical Residual Functional Capacity Assessment. Lassiter opined that Plaintiff can lift or carry 20 pounds occasionally and ten pounds frequently, can stand, walk or sit six hours in an eight-hour workday, can occasionally climb ladders, ropes and scaffolds and frequently climb stairs and ramps, can balance, stoop, kneel, crouch, or crawl, has limited overhead reach, and should avoid heights. (Tr. 305-312).

On December 13, 2004, Andre J. Fontana, M.D., conducted a physical examination of Plaintiff at the request of the Agency. His examination revealed cervical spine forward flexion of 40%, extension of 20%, rotation right and left of 20%, flexion right and left of 10%, bilateral trapezius tightness, and possible slight numbness in the median nerve distribution. He further found that the lumbar spine has 45% flexion, 15% extension, and 20% lateral flexion left and right. Dr. Fontana noted that a lateral view cervical x-ray shows minimal spurring at the 5-6 cervical levels, and that AP x-rays of the cervical spine, and lateral and AP x-rays

26

of the lumbar spine "appear to be normal." He notes that, by history, a cervical MRI indicates a 2 mm concentric right paracentral posteriorly protruding disc, C2-3, 2 mm concentric posterior herniated disc 3-4, 2-3 mm concentric posterior central and herniated disc C4-5, and 3 mm circumferential posteriorly central and herniated disc at C5-6. Dr. Fontana opined that Plaintiff was limited to light work. (Tr. 363-364).

Dr. Fontana also prepared a Physical Capacities Evaluation dated December 13, 2004. In the Evaluation, Dr. Fontana opined that Plaintiff is limited to sitting/standing/walking for one hour at a time, and sitting eight hours, standing six hours, and walking four hours total in an eight-hour workday. He also limited Plaintiff to occasionally lifting up to 25 pounds and frequently lifting up to 20 pounds, occasionally bending, squatting, crawling, and climbing, and frequently reaching. He opined that Plaintiff can never work at unprotected heights, that Plaintiff is moderately restricted from activities around moving machinery, and is mildly restricted from driving automotive equipment. (Tr. 365).

**A. Whether the ALJ erred by rejecting the opinions of Mr. Pettaway's treating physicians and finding that he retains the residual functional capacity to perform light work.**

In the case <u>sub judice</u>, Plaintiff argues that the ALJ erred in crediting the opinion of one-time consultative Dr. Fontana over the opinions of Plaintiff's treating physicians. According to Plaintiff, the ALJ's reasons for failing to give proper weight to

27

the opinions of the treating physicians "fall short of being persuasive."  Plaintiff notes that while the ALJ pointed out that Dr. Fontana is a specialist in the field of orthopedics and has extensive training, knowledge and experience in assessing musculoskeletal impairments and their impact on a person's functional capacity, that was not a legitimate reason given that all of the physicians who treated Plaintiff at Orleans Orthopaedic Associates are orthopedists as well.  Plaintiff also points out that unlike Dr. Fontana, "the treating orthopedists at Orleans Orthopaedic Associates had a longstanding treatment relationship with Mr. Pettaway, had more information to assist them in determining his limitations, and thus, were in a much better position than Dr. Fontana to assess Plaintiff's limitations." (Doc. 12 at 12-17).

The opinion of a treating physician "must be given be given substantial or considerable weight unless 'good cause' is shown to the contrary."  "Good cause" exists where: 1) the opinion was not bolstered by the evidence; 2) the evidence supported a contrary finding; or 3) opinion was conclusory or inconsistent with the doctor's own medical records.  Phillips v. Barnhart, 357 F. 3d 1232, 1340-41 (11th Cir. 2004); See also Lewis v. Callahan, 125 F.3d 1436, 1439-1441 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); and 20 C.F.R. §

404.1527(d).  See also Johnson v. Barnhart, 2005 WL 1414406, *2
(11th Cir. Jun. 17, 2005); Wind v. Barnhart, 2005 1317040, *6 (11th
Cir. Jun. 2, 2005) (citing to Crawford v. Comm'r of Social
Security, 363 F.3d 1155, 1159 (11th Cir. 2004)) Johnson, 2005 WL
1414406, *2; Wind, 2005 1317040, *6.  "The ALJ must clearly
articulate the reasons for giving less weight to the opinion of a
treating physician, and the failure to do so is reversible
error[;]" likewise, he commits error if he substitutes his own
uninformed medical evaluations for those of a claimant's treating
physicians absent good cause.  (Id.)  Of course, it is the ALJ's
duty, as finder of fact, to choose between conflicting evidence and
he may reject the opinion of any physician when the evidence
supports a finding to the contrary.  (Id.) (citing to Landry v.
Heckler, 782 F.2d 1551, 1554 (11th Cir. 1986) and Bloodsworth, 703
F.2d at 1240).[4]

In giving Dr. Fontana's functional assessment controlling
weight, the ALJ determined that:

> ...the physical capacity assessment published by Dr.
> Fontana, an orthopedist, most accurately depicts the
> effects of the claimant's impairments have on his ability
> to perform work and work-life tasks.  Dr. Fontana fully
> examined the claimant, interpreted cervical and lumbar x-

---

[4] See also Blake v. Massanari, 2001 WL 530697, *10 n.4 (S.D. Ala. Apr.
26, 2001); 20 C.F.R. § 404.1527(d)(2).  The Eleventh Circuit has repeatedly
made clear that the opinion of a treating physician must be given substantial
weight unless good cause is shown for its rejection.  See, e.g., Lamb v.
Bowen, 847 F.2d at 703; Walker v. Bowen, 826 F.2d 996, 1000 (11th Cir. 1987);
Sharfarz v. Bowen, 825 F.2d at 279-80; Schnorr v. Bowen, 816 F.2d 578, 581
(11th Cir. 1987); McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987);
MacGregor v. Bowen, 786 F.2d at 1053; Wilson v. Heckler, 734 F.2d 513, 518
(11th Cir. 1984); and 20 C.F.R. § 404.1527(d)(2).

rays, and reviewed prior M.R.I. evidence and the
claimant's medical history in reaching the ultimate
conclusion of the claimant's physical capacities and
limitations. Dr. Fontana is a specialist in the field of
orthopedics, and has extensive training, knowledge and
experience in assessing musculoskeletal impairments and
their impact on a person's functional capacity. The
Administrative Law Judge is aware that Dr. Fontana is an
examining physician, but has concluded that Dr. Fontana's
opinion is most consistent with the diagnostic studies
and physical examinations of record (as described
herein). Dr. Fontana placed rather significant
restrictions on the claimant, particularly given the
claimant's young age. The fact that Dr. Fontana
recognized the severity of the claimant's impairments and
felt that the claimant could perform only light work
activity gives further credibility to the opinion.

(Tr. 24). The ALJ further noted that although Plaintiff's doctors

and a physician's assistant at Orleans Orthopaedic Associates

placed greater restrictions on the Plaintiff, he did not give

controlling weight to those opinions because:

To begin with, the opinions by the claimant's providers
are inconsistent with the claimant's longitudinal
treatment notes. The exam findings (considered over the
course of his treatment) by the claimant's doctors in
terms of strength, range of motion, neurological
functioning, gait, cranial nerve functioning and other
factors do not conclusively warrant such limitations as
those put on the claimant's ability to sit, stand, walk,
raise his arms above his shoulder level, reach and stay
in one position at a time without having to alternate
positions. The Administrative Law Judge is fully aware of
the claimant's musculoskeletal condition, but by limiting
the claimant to light work, as it is defined in the
Regulations and Social Security Rulings, the undersigned
has set forth a residual functional capacity that takes
into account the objective and credible limitations that
can be expected from the claimant's cervical degenerative
disc disease and lumber strain. Furthermore, the
claimant's daily activities (as described elsewhere in
this decision) do not paint the picture of an individual
who has the severe limitation that were placed on him by
the providers at Orleans Orthopaedic Associates.

(<u>Id.</u>)    The ALJ also noted that some of Plaintiff's doctors indicated that Plaintiff had a total, but temporary, disability, and that oftentimes in the treatment of worker's compensation claimants, the term is used until a decision can be made on the permanent limitations that a person may have as a result of a job injury, and that in any event, the decision about whether Plaintiff is disabled is not a medical question, but one reserved for the commissioner.    (<u>Id.</u>)    The ALJ further noted that the physical capacities evaluation and pain questionnaire were prepared by a physician's assistant instead of a doctor; thus it was not considered an acceptable medical source.  According to the ALJ, the physician's assistant provided no rationale whatsoever to support the opinions contained in the evaluations.    (Tr. 25).  Additionally, the ALJ noted that while Dr. Phillips indicated in 2002 that Plaintiff was unable to perform "manual labor," he admitted that his assessment was made without benefit of the diagnostic studies he needed to perform on claimant to properly diagnosis his condition.  (<u>Id.</u>)

Based upon a careful review of the record, the undersigned finds that the ALJ's rationale for rejecting the opinions of Plaintiff's treating physicians is not set forth in sufficient detail so as to allow the Court to conduct a meaningful review.  At page 24 of the decision, the ALJ, in summary fashion, found that the opinions of Plaintiff's providers were inconsistent with

Plaintiff's longitudinal treatment notes and that the exam findings (considered over the course of his treatment) by the Plaintiff's doctors in terms of strength, range of motion, neurological functioning, gait, neurological functioning and other facts do not conclusively warrant the limitations placed on Plaintiff's ability to sit, stand, walk, raise his arms above shoulder level, reach and stay in one position at a time without having to alternate positions.  As noted supra, the records reflect that during the relevant time period, Plaintiff was seen by three different physicians at Orleans Orthopaedic Associates with complaints of neck and back pain.  The ALJ's decision does not explain the specific inconsistencies which he determined existed between the opinions of these physicians and their treatment notes.  Dr. Phillips, one of the treating physicians, indicated that while testing of Plaintiff's lumbar spine was negative, including the MRI, discogram and the EMG, his physical examination of Plaintiff revealed abnormalities in both the cervical and lumbar spine.

Additionally, Dr. Adatto noted abnormalities on his physical examination of Plaintiff.  He found that while the cranial nerves II-XII were grossly intact, and there was a full range of motion of the shoulders, as well as symmetrical muscular development and strength of both upper extremities, there was moderate tenderness of the muscles, spasms and loss of limitation of motion.  Moreover, straight leg raising consistently reproduced low back pain

32

discomfort and leg pain in the sitting and recumbent position. (Tr. 315). In July 2003, Dr. Adatto opined that Plaintiff should avoid repetitive looking up and down, and working with his arms above his shoulders. (Tr. 319-321). In his decision, the ALJ found that Plaintiff experiences some range of motion loss in his neck and back, and opined that the motion loss could be addressed by limiting Plaintiff to light work; however, he did not explain his finding that the limitations imposed by Dr. Adatto and the other treating physicians were not consistent with their treatment records. Because the ALJ did not detail the specific inconsistencies alluded to in his Order, the Court is left to speculate and surmise regarding the alleged inconsistencies. This is not appropriate particularly where the ALJ credited the opinions of a one time examining physician over treating physicians who provided ongoing treatment to plaintiff. Lewis v. Callahan, 125 F. 3d 1436, 1440-41 (11th Cir. 1997)(the opinion of an examining physician may not be accepted over the contrary opinion of a treating physician unless there is good cause for crediting the examining physician's opinion over the opinions of the treating physician.) Accordingly, the undersigned recommends that this case be remanded so that the ALJ can detail the alleged inconsistencies between the opinions of Plaintiff's treating physicians and their treatment records. In the absence of such, the Court is unable to meaningfully review the ALJ's determination.

**B.   Whether the ALJ failed to properly evaluate Mr. Pettaway's testimony of disabling pain.**

In his brief, Plaintiff also alleges that the ALJ erred in failing to properly evaluate his testimony of disabling pain. (Doc. 12 at 17).   In support of his claim of disabling pain, Plaintiff relies on his treatment records, including the Clinical Assessment of Pain form completed by Sarah Bolt. Plaintiff also cites his hearing testimony wherein he indicated that he experiences neck pain that seems to radiate to his lower back, that he has to rest, on and off, on average of three (3) hours a day, and that he takes Lortab for his neck and back pain.   Based upon a review of the record, the undersigned finds that the ALJ's finding that Plaintiff's allegations of severe pain cannot be considered wholly credible is supported by substantial evidence.

 Pain is a non-exertional impairment.   <u>Foote</u>, 67 F.3d at 1559; 826 F.2d at 1003.   Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (<u>e.g</u>., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.   42 U.S.C. § 423 (d)(5)(A).   The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.    20 C.F.R. § 404.1529.    In determining whether the medical signs and laboratory findings show

medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard:"

> (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

Foote, 67 F.3d at 1560.  See also Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423 (d)(5)(A).

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  Foote, 67 F.3d at 1561-1562; Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. See Hale v. Bowman, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  Foote, 67 F.3d at 1561-1562; Cannon v. Bowen,

858 F.2d 1541, 1545 (11th Cir. 1988).  A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  See, e.g., Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote, 67 F.3d at 1562.

In the case sub judice, the ALJ found that while it is credible that Plaintiff experiences some pain and symptoms resulting from his impairments, it is not credible that he experiences the level of pain and symptomatology to the extent alleged.  In reaching his opinion, the ALJ noted that Plaintiff's complaints of disabling pain are inconsistent with his activities of daily living, and noted that Plaintiff reported that he provides care for his three year old child while his wife works an 8 to 5 job, he performs some household chores, he drives his older children to school, and tends to them after school, and he provides for his own personal care.  Additionally, the ALJ noted that Plaintiff had not required any hospitalizations for pain, and the treatment records of his treating physicians repeatedly noted that Plaintiff tolerated his medications well and had no significant side effects from his pharmacological regimen.  The ALJ also

36

declined to assign any weight to the pain evaluation authored by Ms. Bott because as a physician's assistant, she was not an acceptable medical source, and because she provided no rationale whatsoever to support the opinions detailed in the pain evaluation. (Tr. 26-27).

As determined by the ALJ, Plaintiff's allegations of disabling pain are not supported by the record.  The evidence reflects that Plaintiff was treated with medication and home exercises.  He was never hospitalized for pain management nor referred to a pain clinic.  Plus, the treatment records reflect that Plaintiff tolerated his medication well, and there is nothing in the records of Plaintiff's treating physicians which indicates that he ever complained of any side effects or other problems with his medication.  Moreover, as noted by the ALJ, the record reflects that Plaintiff was able to engage in light household chores,  care for his children, including a toddler who was home with him all day, and care for his personal needs. Additionally, Plaintiff reported to Dr. Williams that he also goes to church occasionally, runs errands every now and then, talks on the telephone and helps his daughters with their homework. Moreover, Ms. Bolt's pain evaluation was properly rejected because she did not provide any basis for the conclusory allegations contained in the evaluation. Ms. Bolt did not reference any treatment records in her evaluation, nor does she identify any underlying facts upon which the

evaluation was based.  In the face of this substantial record evidence, the ALJ did not err in finding that while it is credible that Plaintiff experiences some pain and symptoms resulting from his impairments, it is not credible that he experiences the level of pain and symptomatology to the extent alleged.

**C.   Whether the ALJ erred in finding that Mr. Pettaway has no severe mental impairment.**

Plaintiff also asserts that the ALJ erred in finding that Plaintiff does not have a severe mental impairment.  According to Plaintiff, in her consultative psychological evaluation, Dr. Williams opined that Plaintiff's affect was normal to tearful and his mood mildly depressed, and she diagnosed him with depression, NOS.  Plaintiff also notes that the State Agency physician, Patricia Hinton, Ph.D., diagnosed him with Depression NOS, and found that he had a mild restriction of activities of daily living, mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. (Doc. 120 at 27-29).

Where as here, a plaintiff is not involved in substantial gainful activity, the Commissioner "determines whether a claimant has a 'severe' impairment or combination of impairments that cause more than a minimal limitation on a claimant's ability to function." Davis v. Shalala, 985 F.2d 528, 532 (llth Cir. 1993). The plaintiff bears the burden of proving that he has a severe impairment or combination of impairments. Jones v. Apfel, 190 F.3d

1224, 1228 (11th Cir. 1999).   The Eleventh Circuit, in <u>McDaniel</u> <u>v. Bowen</u>, 800 F. 2d 1026 (11th Cir. 1986), explained that:

> [a]t step two of § 404.1520 and § 416.920 a claimant's impairment is determined to be either severe or not severe.  Step two is a threshold inquiry.  It allows only claims based on the most trivial impairments to be rejected.  The claimant's burden at step two is mild.  An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.  Claimant need show only that her impairment is not so slight and its effect is not so minimal.

<u>Id.</u> at 1031.   Accordingly, "an impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."   20 C.F.R. § 404.1521( ); see also <u>Crayton v.</u> <u>Callahan</u>, 120 F.3d 1217, 1219 (11th Cir. 1997).

In his decision, the ALJ found "no objective evidence of any underlying mental impairment that has resulted in more than minimal functional limitations for a period of at least 12 consecutive months" and thus concluded that Plaintiff does not have a "severe" mental impairment. (Tr. 17).  The ALJ also noted that Plaintiff had not sought treatment from a psychologist and/or psychiatrist for any mental impairment, and had only received a prescription from his orthopedist. The ALJ further noted that the State Agency had apparently relied upon the evaluation of Dr. Williams in finding that the only limitation resulting from Plaintiff's depression was his ability to perform only unskilled jobs.  (Tr. 17-18).

Contrary to Plaintiff's contention, substantial evidence supported the ALJ's finding that Plaintiff does not have a "severe" mental impairment. While Dr. Williams diagnosed Plaintiff with a depressive disorder, her examination of Plaintiff revealed that his thought processes were grossly intact and no loose associations, tangential or circumstantial thinking was noted. Dr. Williams also opined that Plaintiff could handle his own affairs and that he would have a favorable response to treatment. (Tr. 283-285). Moreover, while Dr. Phillips initially questioned whether Plaintiff should undergo a psychological evaluation, he later observed that he did not think that Plaintiff's problem was psychological. (Tr. 328, 330). In October 2002, Dr. Phillips observed that Plaintiff was oriented to time, place and person, was in no acute distress and showed no sign of depression or anxiety. (Tr. 326). Furthermore, there is no evidence that Plaintiff ever sought any psychological or psychiatric treatment. Accordingly, the undersigned finds that the substantial evidence reflects that Plaintiff's depressive disorder did not significantly limit his ability to do basic work activities.

## V.   Conclusion

For the reasons set forth, and upon careful consideration of the administrative record and memoranda of the parties, it is recommended that the decision of the Commissioner of Social Security, denying Plaintiff's claim for disability insurance

40

benefits and supplemental security income, is due to be reversed and remanded. Upon remand, the ALJ should detail the alleged inconsistencies between the opinions of Plaintiff's treating physicians and their treatment records so as to enable the Court to conduct a meaningful review of the ALJ's determination.

**DONE** this **26th day of March, 2008.**

**_____/s/ SONJA F. BIVINS_____**
**UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.   **Objection**.   Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.   See 28 U.S.C. § 636(b)(1)©; Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).   The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.   The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.   The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.   It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.   Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **Opposing party's response to the objection.**   Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection. Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   **Transcript (applicable where proceedings tape recorded)**. Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.   Any party planning to object to

this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

_____/s/ SONJA F. BIVINS_____
**UNITED STATES MAGISTRATE JUDGE**